Matthew C. Helland, CA State Bar No. 250451
helland@nka.com
NICHOLS KASTER, LLP
One Embarcadero Center, Suite 720
San Francisco, CA  94111
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Rebekah L. Bailey, CA State Bar No. 258551
bailey@nka.com
Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Carl F. Engstrom, MN Bar No. 0396298*
cengstrom@nka.com
Jacob T. Schutz, MN Bar No. 0395648*
jschutz@nka.com
NICHOLS KASTER, PLLP
    *pro hac vice application forthcoming
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Phone: (612) 256-3200
Fax: (612) 338-4878

*Attorneys for Plaintiffs and the proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Jerry Johnson, Jesse Perry, Yolanda Weir, Karen White, Todd Salisbury, Peter Hitt, Patricia Collier, and Verlin Laine, as representatives of the class and on behalf of Fujitsu Group Defined Contribution and 401(k) Plan, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF** |
| v. | **(1) Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)** |
| Fujitsu Technology and Business of America, Inc., itself and as successor in interest to Fujitsu Management Services of America, Inc., the Fujitsu Group Defined Contribution and 401(k) Plan Administrative Committee, the Fujitsu Group Defined Contribution and 401(k) Plan Investment Committee, Shepherd Kaplan LLC, Pete Apor, Belinda Bellamy, Sunita Bicchieri, and John Does 1-30, | **(2) Failure to Monitor Fiduciaries** |
| Defendants. | |

**NATURE OF THE ACTION**

1.     Plaintiffs Jerry Johnson, Jesse Perry, Yolanda Weir, Karen White, Todd Salisbury, Peter Hitt, Patricia Collier, and Verlin Laine ("Plaintiffs"), individually and as representatives of the class described herein, and on behalf of the Fujitsu Group Defined Contribution and 401(k) Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.     Plaintiffs assert their class claims against the Plan's fiduciaries –Fujitsu Technology and Business of America, Inc. ("Fujitsu"), the Fujitsu Group Defined Contribution and 401(k) Plan Administrative Committee (the "Administrative Committee"), the Fujitsu Group Defined Contribution and 401(k) Plan Investment Committee (the "Investment Committee"), Shepherd Kaplan LLC ("Shepherd Kaplan"), Pete Apor, Belinda Bellamy, Sunita Bicchieri, and John Does 1–30 (together, the "Defendants") – who failed to manage the Plan in a prudent and loyal manner.

3.     As described herein, Defendants have breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

**PRELIMINARY STATEMENT**

4.     As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans, more than two-thirds of which is held in 401(k) plans. *See* Investment Company Institute, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), *available at* https://www.ici.org/research/stats/retirement/ret_15_q4; Plan Sponsor, *2015 Recordkeeping Survey* (June 2015), *available at* http://www.plansponsor.com/2015-Recordkeeping-Survey/. These defined contribution plans have largely replaced the defined benefits plans—or pension plans—that were predominant in previous generations. *See* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their employees, whereas only 3% offered pension plans. *Id.*

5.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments.

6.      But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no financial incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the employee. In fact, employers often benefit from retaining high-cost investments in the Plan, because such investments often offer a kickback, known as "revenue sharing," to subsidize the Plan's administrative costs. This is manifested in conduct such as failing to remove a high-cost retail mutual fund where the exact same fund is available in a low cost institutional share class, or as an ultra-low cost separate account or collective trust vehicle.

7.      The real life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career. *See* http://money.cnn.com/2013/03/27/retirement/401k-fees/. Put another way, excess fees can force a worker to work **an extra five to six years** to make up for the excess fees that are paid. *Id.*

8.      To protect workers from mismanagement of their hard-earned retirement assets, ERISA imposes strict duties of loyalty and prudence upon plan fiduciaries. 29 U.S.C. § 1104(a)(1). These fiduciary duties are "the highest known to law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quotation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

9.      Defendants have breached their fiduciary duties of loyalty and prudence by designing and administering one of the most expensive large 401(k) plans in the country. As of the end of 2013, the Plan had approximately $1.3 billion in assets. Among defined-contribution plans with more than $1 billion in assets, the average plan has costs equal to 0.33% of the plan's assets per year. The Plan's costs greatly exceed this average. In 2013, total fees amounted to approximately 0.88% of Plan assets, or about $11,400,000. In 2014, total fees amounted to approximately 0.90% of Plan assets, or about $11,900,000. These fees are almost three times higher than the average for plans of similar size, making the Plan **one of the five most expensive defined contribution plans out of approximately 650 plans** with assets of over $1 billion dollars. Had the Plan simply maintained average expenses (which likely exceed the costs a prudent fiduciary would incur), the Plan would have paid only $4,260,000 in fees in 2013, and $4,400,000 in fees in 2014, demonstrating that the Plan incurred **at least $7 million per year in excess fees**.

10.      The Plan's high costs are attributable to three factors, each of which constitutes a breach of Defendants' fiduciary duties. First, Defendants failed to utilize the least expensive available share class for many mutual funds within the Plan. Second, Defendants caused the Plan to pay recordkeeping and administrative expenses far in excess of what a prudent fiduciary would pay for those same services. Third, Defendants systematically failed to manage the Plan's investments in a cost-conscious manner, selecting and retaining investments without regard for the cost of those investments and without considering the availability of far cheaper options that would have provided comparable or superior investment management services.

11.      In addition to failing to manage the Plan in a cost-conscious manner, Defendants also breached their fiduciary duties by imprudently designing and implementing the Plan's target-date funds. In October 2011, Defendants transferred the large majority of the Plan's assets into a set of custom "target-date" funds designed by Defendant Shepherd Kaplan, LLC. Generally, each target-date fund is identified by a target retirement date. The target-date fund's asset allocation is then automatically adjusted to become more conservative as the target date approaches and Plan participants get closer to retirement (i.e., the "target-date"). Despite a marketplace replete with

-3-

competitive target-date fund offerings and experienced investment advisers, Defendants hired Shepherd Kaplan—an investment advisor with no public track record of managing or designing target-date funds—to create a set of custom target-date funds and select the mutual funds that make up each target-date fund. Predictably, given the investment advisor's apparent inexperience and lack of a published track record, the asset allocations within these target-date funds were fundamentally flawed, allocating a wildly excessive percentage of assets to speculative asset classes such as natural resources, emerging market stocks, emerging market bonds, and real estate limited partnerships. More generally, the asset allocation strategies reflected a fixation with unique and nontraditional asset and sub-asset classes. Additionally, the underlying investments used to populate the target-date funds were inappropriate given their idiosyncratic investment methodology and documented failure to adhere to a consistent investment style, making them fundamentally incompatible with a target-date asset allocation model, which depends upon each investment adhering to its designated asset or sub-asset class. To make matters worse, many of the mutual funds held within these target-date funds had little to no track record. As a result of these fundamental flaws in design and implementation, since their inception the Fujitsu target-date funds have underperformed their benchmark indices by several percentage points per year on an overall basis.

12.     Defendants' failure to prudently evaluate and manage the Plan's recordkeeping and administrative fees, their failure to obtain the least expensive share classes for the Plan, their selection and retention of funds with excessively high fees, and their imprudent design and implementation of the Plan's custom target-date funds, constitute breaches of their fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breaching their fiduciary duties of loyalty and prudence (Count One) and for failure to monitor fiduciaries (Count Two).

## **JURISDICTION AND VENUE**

14.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of a

-4-

plan to remedy breaches of fiduciary duties and other unlawful conduct in violation of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

15.     This case presents a federal question under ERISA, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

16.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the District where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

17.     Pursuant to Local Rule 3-2, this case is properly assigned to the San Jose Division of the Northern District because this case arose in Santa Clara County. According to the Plan's Form 5500s, the Plan is operated in Sunnyvale, California (Santa Clara County).

## THE PARTIES

### Plaintiffs

18.     Plaintiff Jerry Johnson ("Johnson") has participated in the Plan since 2006, and is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3). Within the six years prior to the filing of this action, Johnson has been invested in over a dozen different investment options in the Plan through his investment in the Fujitsu LifeCycle 2035 Fund, including several that had excessive fees and/or were not the least expensive share class available for that particular fund. Johnson resides in McKinney, Texas.

19.     Plaintiff Jesse Perry ("Perry") participated in the Plan from 2011 to 2015, when his account balance was distributed from the Plan. Perry is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. Within the six years prior to the filing of this action, Perry was directly invested in at least five mutual funds in the Plan in addition to over a dozen different Plan investment options Perry held through his investment in the Fujitsu LifeCycle 2025 Fund. Many of these investments had excessive fees and/or were not the least expensive share class available for that particular fund. Perry resides in Carrollton, Texas.

20.     Plaintiff Yolanda Weir ("Weir") has participated in the Plan since 2010, and is a

-5-

current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3). Within the six years prior to the filing of this action, Weir was invested in over a dozen different investment options in the Plan through her investment in the Fujitsu LifeCycle 2030 Fund, including several that had excessive fees and/or were not the least expensive share class available for that particular fund. Weir resides in Euless, Texas.

21.     Plaintiff Karen White ("White") participated in the Plan from 2009 to 2012. White is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account would have been worth at that time had Defendants not violated ERISA as described herein. Within six years of the filing of this action, White was invested in at least eight different mutual funds offered by the Plan, including several that had excessive fees and/or were not the least expensive share class available for that particular fund. White resides in Corinth, Texas.

22.     Plaintiff Todd Salisbury ("Salisbury") participated in the Plan from 1999 to 2014. Salisbury is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. Within the six years prior to the filing of this action, Salisbury was invested in at least 32 different mutual funds within the Plan, including multiple funds that had excessive fees, share classes of multiple funds that were not the least expensive share class available for that investment, and multiple funds that were otherwise imprudently selected or retained by Defendants. Salisbury resides in Lewisville, Texas.

23.     Plaintiff Peter Hitt ("Hitt") participated in the Plan from 2009 to 2015. Hitt is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. Within the six years prior to the filing of this action, Hitt was invested in over a dozen different investment options in the Plan through his investment in the Fujitsu LifeCycle 2040 Fund, including several that had excessive fees and/or were not the least expensive share class available for that particular

fund. Hitt resides in Plano, Texas.

24. Plaintiff Patricia Collier ("Collier") participated in the Plan from 2010 to 2013. Collier is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account would have been worth at that time had Defendants not violated ERISA as described herein. Within the six years prior to the filing of this action, Collier was invested in over a dozen different investment options in the Plan through her investment in the Fujitsu LifeCycle 2020 Fund, including several that had excessive fees and/or were not the least expensive share class available for that particular fund. Collier resides in Irving, Texas.

25. Plaintiff Verlin Laine ("Laine") has participated in the Plan since 2007, and is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3). Within the six years prior to the filing of this action, Laine was invested in over a dozen different investment options in the Plan through his investment in the Fujitsu LifeCycle 2045 Fund, including several that had excessive fees and/or were not the least expensive share class available for that particular fund. Laine resides in Saint Albans, New York.

**The Plan**

26. The Plan was originally established effective April 1, 1985, and since its inception, a number of other 401(k) plans merged with and into the Plan.

27. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

28. The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

29. According to the Plan's Form 5500s, the Plan is operated in Sunnyvale, California (Santa Clara County).

30. The Plan has been amended and restated multiple times since it was established. The most recent restatement of the Plan was effective April 1, 2012. This Plan Document is attached as **Exhibit A**. The Plan has been amended twelve times since the most recent restatement, most recently on December 12, 2015. Two of these amendments are notable. First, a

-7-

1   December 31, 2013 amendment to the Plan (with an "effective date" of January 15, 2013)

2   (attached as **Exhibit B**) made significant changes to the management and administration of the

3   Plan. Second, a July 16, 2014 amendment (with an "effective date" of March 1, 2014) (attached

4   as **Exhibit C**) changed the entity sponsoring the Plan.

5       31.     The Plan covers eligible employees of Fujitsu and its various affiliates and/or

6   subsidiaries. *See* Ex. A §§ 1.10, 1.22, 1.43, App'x C; Ex. C.

7       32.     Fujitsu and its various affiliates and/or subsidiaries provide limited matching

8   contributions for amounts employees contribute to the Plan. For example, Fujitsu General

9   America, Inc. matches 100% of the first 3% of an employee's pay contributed to his or her 401(k)

10  per year.

11      33.      The Plan has had over $1 billion in assets throughout the relevant period. As of

12  the end of 2010, the Plan had approximately $1.17 billion in assets. As of the end of 2014, the

13  Plan had approximately $1.33 billion in assets.

14                          **Defendants**

15  *The Administrative Committee*

16      34.     The Administrative Committee and its members are designated in Section 1.2 of

17  the Plan Document (both before and after the Dec. 2013 Amendment) as the "administrator" of

18  the Plan under 29 U.S.C. § 1002(16)(A). Under the original Plan Document, the Administrative

19  Committee had "authority to administer the Plan in those respects unrelated to investment." Ex. A

20  § 8.1. The December 2013 Amendment did not substantively alter this responsibility. *See* Ex. B ¶

21  K (the Administrative Committee is fiduciary regarding "benefit eligibility and administration of

22  the Plan.")

23      35.     As administrator, the Administrative Committee and its members are responsible

24  for selecting and monitoring the Plan's recordkeeper, consultants, and other service providers. As

25  part of that duty, the Administrative Committee was obligated to ensure that the Plan was making

26  prudent use of all available revenue sharing, and for ensuring that the recordkeeper's

27  compensation and other service providers' compensation was reasonable, taking into account the

28  availability of revenue sharing money.

36.     The Administrative Committee and its members are designated as Plan fiduciaries in Section 1.39 of the Plan Document, and thus are named fiduciaries of the Plan under 29 U.S.C. § 1102(a). *See also* 29 C.F.R. § 2509.75-8 at D-3. In addition, the Administrative Committee and its members are functional fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting the management of the Plan and the management of disposition of Plan assets, and possessed discretionary authority and responsibility in the administration of the Plan. As of March 28, 2012, the members of the Administrative Committee were Pete Apor, Belinda Bellamy and Sunita Bicchieri. The names of all other members of the Administrative Committee since June 2010 are currently unknown to Plaintiffs, and those individuals are therefore collectively named as John Does 1–10.

***Investment Committee***

37.     The December 31, 2013 Amendment also created an Investment Committee with "full authority to purchase, manage and sell" a small number of investments that, after the Amendment, were no longer under the authority of the Investment Fiduciary. Ex. B ¶¶ E, K. The Investment Committee consists of "members with various corporate titles or positions as designated by [Fujitsu] or the Investment Committee from time to time." *Id.* at ¶ E.

38.     The Plan Document identifies the Investment Committee as a named fiduciary. Ex. B ¶ H. The Investment Committee is therefore a fiduciary of the Plan under 29 U.S.C. § 1102(a). In addition, the Investment Committee is a functional fiduciary of the Plan under 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority and/or discretionary control respecting the management and disposition of Plan assets. The members of the Investment Committee since 2013 are currently unknown to Plaintiffs, and those individuals are therefore collectively named as John Does 11-20.

39.     Section 8.5 of the Plan Document allows the Administrative Committee and (after it was created) the Investment Committee to delegate their fiduciary responsibilities to others. Ex. A § 8.5; Ex. B ¶ M. Any individual or entity to whom Defendants delegated any fiduciary functions or responsibilities is also a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A). Because the individuals and/or entities that have been delegated fiduciary responsibilities by

-9-

Defendants are not currently known to Plaintiffs, they are collectively named as John Does 21–30.

***Fujitsu***

40.     Defendant Fujitsu Technology and Business of America, Inc. ("Fujitsu") is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). Fujitsu is a subsidiary of Fujitsu Limited of Japan, and is headquartered in Sunnyvale, California.

41.     Fujitsu was named plan sponsor effective March 1, 2014. *See* Ex. C ¶ 2. Fujitsu is the successor in interest to Fujitsu Management Services of America, Inc., the prior Plan sponsor that was dissolved by parent company Fujitsu Limited of Japan. As the current plan sponsor and the successor in interest to the prior sponsor, Fujitsu is liable for all acts and omissions of Fujitsu Management Services of America, Inc. in its prior capacity as the plan sponsor.[1]

42.     Prior to the December 2013 Plan amendment, the composition of the Administrative Committee was defined by corporate titles (that is, the committee consisted of the "Director, Retirement Services", among others). Ex. A. § 1.9. Subsequent to the December 2013 Amendment, the Administrative Committee was redefined[2] as consisting of "members with various corporate titles or positions as designated by [Fujitsu] or the [Administrative] Committee from time to time." Ex. B ¶ B. Likewise, the Investment Committee was defined as "consist[ing] of members with various corporate titles or positions as designated by the Company or the Investment Committee from time to time." Ex. B ¶ E.

43.     Because Fujitsu possessed de facto and later actual authority to appoint and remove members of the Administrative Committee and the Investment Committee, Fujitsu exercised discretionary authority and control respecting management of the Plan, and had discretionary authority and responsibility in the administration of the Plan. Fujitsu is therefore a functional fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A). The responsibility for appointing and removing members of the Administrative Committee and Investment Committee

---

[1] For the sake of clarity, the term "Fujitsu" shall refer to both the prior and current Plan sponsor throughout the Complaint.

[2] The name of the Administrative Committee as given by the Plan Document also changed from "Committee" to "Administrative Committee" by this amendment.

1  carried with it an accompanying duty to monitor the appointed fiduciaries, to ensure that they
2  were complying with the terms of the Plan and ERISA's statutory standards. *Solis v. Webb*, 931
3  F. Supp. 2d 936, 953 (N.D. Cal. 2012); 29 C.F.R. § 2509.75-8 (FR-17). Furthermore, that
4  monitoring duty carried with it a responsibility to take action upon discovery that the appointed
5  fiduciaries were not performing properly. *See* Dep't of Labor Opinion No. 76–95 (Sept. 30,
6  1976).

7  ***Pete Apor***

8      44.    Defendant Pete Apor ("Apor") is the Director of Retirement Services at Fujitsu,
9  and as of 2012, was identified by the Plan's Trust Agreement (attached as **Exhibit D**) as a
10 member of the Administrative and Investment "Fiduciaries,"[3] responsible for "the administration
11 and operation of the Plan" and the "investment and management of Plan assets." Ex. D at § 2.01,
12 Schedule A. As such, Apor is a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).
13 Furthermore, because the Administrative Committee and its members and the Investment
14 Committee and its members are named fiduciaries under the Plan Document, Apor is a named
15 fiduciary pursuant to 29 U.S.C. § 1102(a).

16 ***Belinda Bellamy***

17     45.    Defendant Belinda Bellamy ("Bellamy") is the Manager of Retirement Services at
18 Fujitsu, and as of 2012, was identified by the Plan's Trust Agreement as a member of the
19 Administrative Committee responsible for "the administration and operation of the Plan." Ex. D
20 at § 2.01, Schedule A. As such, Bellamy is a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

21 ***Sunita Bicchieri***

22     46.    Defendant Sunita Bicchieri ("Bicchieri") is a Senior Retirement Analyst at Fujitsu,
23 and as of 2012, was identified by the Plan's Trust Agreement as a member of the Administrative
24 Committee responsible for "the administration and operation of the Plan." Ex. D at § 2.01,

25

26 [3] The Plan's Trust Agreement specifically refers to Administrative and Investment "Fiduciaries." Plaintiffs assume that "Administrative Fiduciary" refers to the Administrative Committee.
27 However, given that the Plan Amendment creating the Investment Committee was adopted after the date of the Trust Agreement, it is unclear whether the term "Investment Fiduciary" refers to
28 the Named Investment Fiduciary under the Plan Document, the Investment Committee, or both.

-11-

Schedule A. As such, Bicchieri is a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

***Shepherd Kaplan***

47.     Until July 31, 2015,[4] Defendant Shepherd Kaplan LLC was designated by the Plan Document as the "Named Investment Fiduciary." Ex. A. § 1.41. Under Section 8.2 of the Plan, Shepherd Kaplan was responsible for, among other things:

- "The selection of asset classes and the associated investment vehicles within each asset class, including both quantitative and qualitative due diligence and research";

- "The monitoring of the Plan's investments [sic] vehicles on a quarterly basis and the preparation of quarterly reports, which will reflect the performance of the Plan's investments and compare their performance with the benchmarks and peer groups specified in the investment policy statement";

- "The removal and replacement of investment vehicles from time to time as the circumstances warrant";

- "Identifying, managing, accounting for, and to the extent available under the contracts or agreements with respect to the Plan with the custodian, recordkeeper or other applicable third-party service provider, recapturing the costs and expenses associated with the investment vehicles that are made available to participants in the Plan (e.g. finder's fees, 12b-1 fees, sub-transfer agent fees, and concessions from fund management fees)."

Ex. A § 8.2; *see also* Ex. B. ¶ L (describing the Investment Fiduciary's duties the same, except removing responsibility for those investments over which the Investment Committee retained authority and control).

48.     As a named fiduciary in the Plan Document, Defendant Shepherd Kaplan was a fiduciary of the Plan under 29 U.S.C. § 1102(a). In addition, Shepherd Kaplan was a functional fiduciary of the Plan under 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority or discretionary control respecting the management of the Plan, and exercised authority or control

---

[4] Pursuant to an Amendment to the Plan Document dated July 1, 2015 with an "effective date" of July 31, 2015, Callan Associates, Inc. was designated as the Plan's "Named Investment Fiduciary."

respecting the management and disposition of Plan assets.

49.     Each of the Defendants are also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because they enabled other fiduciaries to commit breaches of fiduciary duties through their appointment powers, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of their duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

### ERISA FIDUCIARY DUTIES

50.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     For the exclusive purpose of
>
> (i)     Providing benefits to participants and their beneficiaries; and
>
> (ii)     Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

51.     These ERISA fiduciary duties "are the highest known to the law." *Howard*, 100 F.3d at 1488; *accord Johnson v. Couturier*, 572 F.3d 1067, 1077 (9th Cir. 2009) ("[O]ur holding merely comports with congressional intent in establishing ERISA fiduciary duties as 'the highest known to the law.'") (quoting *Howard*).

### DUTY OF LOYALTY

52.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors

-13-

relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988) (emphasis added).

## DUTY OF PRUDENCE

53. ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). This duty includes, but is not limited to, a duty to select prudent investments. Under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (cited with approval in *Tibble v. Edison Int'l*, 729 F.3d 1110, 1122 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015)).

54. Failing to closely monitor and subsequently minimize administrative expenses wherever possible by surveying the competitive landscape and leveraging the plan's size to reduce fees constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Similarly, selecting higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009); *Tibble*, 729 F.3d at 1137–39.

## SOURCE AND CONSTRUCTION OF DUTIES

55. The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore "[i]n

-14-

determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

56.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). The Introductory Note to the Restatement's chapter on the investment of trust assets further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

57.     In considering whether a fiduciary has breached the duties of prudence and loyalty, the Court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Howard*, 100 F.3d at 1488 (quotation and citation marks omitted). Mere "subjective good faith" in executing these duties is not a defense; "a pure

-15-

heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

**CO-FIDUCIARY LIABILITY**

58.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN**

59.     The Plan is a defined-contribution or 401(k) plan, a type of employee retirement plan in which employees invest a percentage of their earnings on a pre-tax basis. Fujitsu and its subsidiaries and/or affiliates often match those contributions up to a certain percentage of the compensation contributed by participating employees each pay period. Within the Plan, employees may defer a percentage of their compensation on a pre-tax basis (subject to certain limits), and Fujitsu and its subsidiaries and/or affiliates have the discretion to make matching contributions on top of the amounts that an employee contributes. Ex. A § 3.3. Participants direct the investment of these contributions, choosing from among a lineup of options offered by the Plan. *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 9, available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study").

60.     Fiduciaries are obligated to assemble a diversified menu of investment options. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Each investment option is generally a pooled investment product—which includes mutual funds, collective investment trusts, and

-16-

separate accounts—offering exposure to a particular asset class or sub-asset class. ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*"). The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate. Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower. Equity, or stock, investments, are generally defined by three characteristics: (1) where they invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks, and blend funds invest in a mix of both types of stocks). Balanced funds are a type of fund that invests in a mix of stocks and bonds. Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches. Target-date funds are typically invested in a portfolio of other mutual funds.

61.     Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market

-17-

(although this potential is typically not realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), available at http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

62.     In addition to a core menu of designated investment alternatives, many plans (including the Plan at issue here) also provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to a broad array of stocks, bonds, and mutual funds. Ayres & Curtis, *Beyond Diversification* at 1524. However, SDBAs have significant drawbacks. Participants that choose to utilize an SDBA are typically assessed a fee for each trade. For example, participants utilizing the SDBA within the Plan are assessed fees for most types of trades. These fees often make an SDBA a much more expensive option compared to investing in the designated investment alternatives available within the Plan.[5] Costs are also higher because employees investing in mutual funds within an SDBA must invest in retail mutual funds, rather than the lower-cost institutional shares typically available as core investment options within the plan that are only available because of the retirement plan's ability to leverage the negotiating power of the plan's assets. DOL Field Assistance Bulletin 2012-02R, July 30, 2012, available at http://www.dol.gov/ebsa/regs/fab2012-2R.html; Christopher Carosa, CTFA, *Is the Fiduciary Liability of Self-Directed Brokerage Options Too Great for 401k Plan Sponsors?*, Fiduciary News (June 11, 2013), available at http://fiduciarynews.com/2013/06/is-the-fiduciary-liability-of-self-directed-brokerage-options-too-great-for-401k-plan-sponsors/ (last accessed Apr. 27, 2016). Furthermore, SDBA investors often invest in imprudent investments, because there is no fiduciary selecting or monitoring the investments within an SDBA. 29 C.F.R. § 2550.404a-5(f).

63.     The existence of an SDBA option does not excuse plan fiduciaries from maintaining a prudent and appropriate set of core investment options. For the reasons described

---

[5] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants . . . may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4). This definition excludes assets held in a self-directed brokerage account. *Id.* Therefore, fiduciaries are under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA. *Id.* § 2550.404a-5(d).

-18-

above, "the performance is generally lower with self-directed accounts compared to managed portfolios. This translates into low real rates of return and higher retirement failure rates." Marijoyce Ryan, CPP, *Money Management: The Downside of Self-Directed Brokerage Accounts*, The Daily Record (June 26, 2012), available at http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts/ (last accessed Apr. 27, 2016); Dr. Gregory Kasten, *Self-Directed Brokerage Accounts Reduce Success* (2004), at 1, 13–14, available at http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing results of a study showing that self-directed brokerage accounts lagged the performance of a model portfolio of the plan's designated investment options by an average of 4.70% per year).

64.    In addition to their high costs and poor investment outcomes, SDBAs are quite difficult to set up, requiring Plan participants to complete additional paperwork while also requiring a greater investment of time to choose among the hundreds or thousands of investment options. Due to their high costs and administrative complexity, SDBAs are seldom used; only 2% of retirement plan assets are held in SDBAs. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 15 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study"). The statistics are similar for the Plan. As reported on its 2014 Form 5500, only 1.24% of the Plan's assets are held in SDBAs.

**MINIMIZATION OF PLAN EXPENSES**

65.    At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

66.    Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-

plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added); U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

67.    There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses. ICI/Deloitte Study at 17. Investment management expenses are the fees that are charged by investment managers for managing particular investments,[6] and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.* On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

68.    Administrative expenses are expenses for recordkeeping, trustee and custodial services, accounting, etc. These expenses can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing" payments from investment managers to plan service providers typically happen on a quarterly basis based upon an agreed-upon contribution formula. Though revenue sharing arrangements do not automatically constitute prohibited transactions under 29 U.S.C. § 1106(b), plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in which to invest or

---

[6] While a mutual fund company might also perform recordkeeping and other services for individual investors (sending statements or fielding customer service inquiries), these services are segmented within a defined contribution plan. The plan's recordkeeper or trustee provides all of the services within the Plan, while the investment managers provide only one service—managing the investments of the plan.

-20-

make available to plan participants and beneficiaries in self-directed plans." U.S. Dep't of Labor, DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003).

69.     The Plan uses a combination of these methods: a portion of administrative expenses are paid directly from Plan assets, and a portion of these expenses are paid out of the investment expenses charged by the mutual funds within the Plan.

70.     Fiduciaries exercising control over administration of a plan and the plan's investment options can minimize plan expenses by hiring low-cost service providers and by selecting a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale generally result in lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors. *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), available at http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out. In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.28% for plans with over $1 billion in assets. ICI Study at 41.

71.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity

-21-

and familiar with such matters would use in the conduct of an *enterprise of a like character*")
(emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8,
2010) (evaluating the propriety of particular fees and investment decisions in light of the size of
the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL
4289694, at *6, *6 n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment
expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable
compensation should mean compensation commensurate with that paid by similar plans for
similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA
Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

### SELECTION OF APPROPRIATE INVESTMENT OPTIONS FOR INCLUSION IN THE PLAN

72.     With respect to designing the menu of investment options, a substantial body of
academic and financial industry literature provides two critical insights for fiduciaries to consider
when selecting investments to be offered within a plan.

73.     The first critical insight is that fiduciaries must carefully tend to their duty of
investment menu construction—selecting prudent investments, regularly reviewing plan options
to ensure that investment choices remain prudent, and weeding out costly or poorly-performing
investments. Plan participants often engage in "naive diversification," whereby they attempt to
diversify their holdings simply by spreading their money evenly among the available funds. Jill E.
Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L.
Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler,
*Naive Diversification Strategies in Defined Contribution Plans*, 91 Am. Econ. Rev. 79, 96
(2001).

74.     Additionally, once an initial investment allocation has been chosen, 401(k)
participants are prone to inertia, failing to reassess their investment decisions even when
presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do
Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper
(Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in
a ten-year period, 48 percent of participants made no changes at all to their account and 73

1    percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*,

2    *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003)

3    (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders

4    made no trades in the average year and that the average 401(k) investor makes one trade every

5    3.85 years).  For all of these reasons, prudent fiduciaries will limit their menus to a small group of

6    funds that represent sound long-term investments, and remove duplicative or imprudent

7    investments rather than trusting participants to identify the best fund or move their money out of

8    an imprudent investment.

9         75.    The second critical insight provided by academic and financial industry literature

10   is that in selecting prudent investments, the most important consideration is low fees. Numerous

11   scholars have demonstrated that high expenses are not correlated with superior investment

12   management. Indeed, funds with high fees on average perform worse than less expensive funds,

13   even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee*

14   *Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873

15   (2009); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*, at 1993 (summarizing numerous

16   studies showing that "the most consistent predictor of a fund's return to investors is the fund's

17   expense ratio").

18        [T]he empirical evidence implies that superior management is not priced through
         higher expense ratios. On the contrary, it appears that the effect of expenses on
19       after-expense performance (even after controlling for funds' observable
         characteristics) is more than one-to-one, which would imply that low-quality funds
20       charge higher fees. Price and quality thus seem to be inversely related in the
         market for actively managed funds.
21

22   Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

23        76.    While high-cost mutual funds may exhibit positive, market-beating performance

24   over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a

25   particular period is not predictive of whether a mutual fund will perform well in the future.

26   Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck in*

27   *Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund*

28   *Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and

-23-

concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). Any sustainable ability to beat the market that managers do demonstrate is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000). The one exception to the general arbitrariness and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57. Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses. *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## CHANGES TO THE PLAN OVER TIME

77.     The Plan's operations and investment lineup have been overhauled twice in the past six years. Until late 2011, Fidelity acted as the Plan's trustee and recordkeeper, and the Plan offered a dizzyingly large number of funds—approximately 170 different funds as of the end of 2010, approximately 90 of which were managed by Fidelity. The Complaint shall refer to this manifestation of the Plan, in place until late 2011, as the "First Plan Iteration".

78.     In late 2011, the Plan was overhauled when Defendant Shepherd Kaplan became the Plan's investment fiduciary, the Plan's investment lineup was overhauled, and shortly thereafter, New York Life became the Plan's recordkeeper. This second iteration of the Plan included approximately 33 different mutual funds, as well as a series of custom target-date funds called the Fujitsu LifeCycle Funds that were made up of some of the mutual funds held by the Plan, in percentages consistent with each target-date fund's asset-allocation model. *See* Ex. A App'x E (showing asset allocation for each target-date fund); Ex. B App'x E (amending asset allocation of target-date funds). In early 2015, John Hancock acquired New York Life's

-24-

recordkeeping business and became the Plan's recordkeeper. At the beginning of 2016, having learned of Plaintiffs' counsel's investigation of the Plan, Defendants belatedly transferred a number of the Plan's investment options into the least-expensive share class available. This version of the Plan shall be referred to as the "Second Plan Iteration".

79.     Finally, in March 2016, in further response to Plaintiffs' counsel's investigation and impending litigation, Defendants overhauled the Plan's management and investment lineup yet again, hiring a new investment adviser (who is not a named Defendant in this action) as the Plan's investment fiduciary, eliminating all of the "Fujitsu LifeCycle" funds, and introducing in their place a new set of custom target-date funds called the "Fujitsu Diversified" funds. As part of this most recent set of changes to the Plan, Defendants also overhauled the mutual fund lineup within the Plan, replacing the majority of the investments previously held by the Plan. This version of the Plan shall be referred to as the "Current Plan Iteration".  These recent changes to the Plan, made in response to anticipated litigation, reflect that Defendants themselves understood there were serious problems with the Plan's investments and design.

## DEFENDANTS VIOLATIONS OF ERISA

### I.     DEFENDANTS FAILED TO CONTROL PLAN COSTS

80.     One consistent feature of the Plan across multiple iterations of the Plan is high costs. For example, in 2013, taking into account both administrative costs and the cost of the Plan investments, Plaintiffs estimate that total plan costs for 2013 were approximately $11,400,000, equal to 0.89% of the approximately $1.29 billion in Plan assets. In 2014, Plaintiffs estimate that total plan costs were approximately $11,900,000, equal to 0.90% of the approximately $1.33 billion in Plan assets.

81.     These costs are extraordinarily high for a defined-contribution plan with over $1 billion in assets. In 2012, the average total plan cost for plans with over $1 billion in assets was 0.28%. ICI Study at 41. Ninety percent of plans with over $1 billion in assets had total plan costs of less than 0.52% in 2012. ICI Study at 42. Indeed, in 2013 and 2014, among the approximately 650 plans with over $1 billion in assets, the Plan is one of only five plans with over a billion dollars in assets with expenses over 0.74% per year in both 2013 and 2014, and in fact, appears to

have been **the most expensive plan in America** in 2013 and 2014 **among plans with over $1 billion in assets**.

82.     Defendants' failure to rein in Plan costs caused significant losses to Plan participants. Had the Plan limited its expenses to the average total cost of 0.28% for similarly-sized plans, Plan participants would have been saved approximately $8.18 million in fees in 2014 alone.

83.     The Plan's high costs have three primary causes. First, prior to the Current Plan Iteration, Defendants systematically failed to utilize the lowest cost share class available. Second, Defendants failed to control the Plan's recordkeeping expenses. Third, Defendants' decision-making processes for selecting and monitoring investments in the Plan systematically failed to give proper consideration to the costs of each investment.

**A.     Defendants Failed to Use the Lowest Cost Share Class of Many Mutual Funds in the Plan.**

84.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than the cost—the funds hold identical investments and have the same manager.

85.     Large defined contribution plans such as the Plan have sufficient assets and negotiating power to qualify for the lowest cost share class available. A fiduciary to a large defined contribution plan such as the Plan can use its asset size to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will select the lowest-priced share class available. As the president of a fiduciary advisory company recently stated, failing to use the least expensive class of shares is an "egregious fiduciary breach[]" that "wast[es] plan assets" and is "clearly imprudent." Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENT NEWS (Jan. 21, 2016), *available at*     http://www.investmentnews.com/article/20160121/BLOG09/160129985/recent-class-action-

-26-

surge-ups-the-ante-for-401-k-advice (emphasis added). Although lower-cost classes of shares sometimes have minimum purchase requirements, a plan with significant assets (even those with less than the Plan's $1 billion-plus in assets) will either meet these requirements, or can negotiate waivers of them.

86.    Until the most recent overhaul of the Plan, Defendants did not procure the least expensive available share class of the investments in the Plan. Instead, Defendants utilized more expensive classes of shares for many investments in order to generate increased revenue sharing dollars to pay the Plan's expenses (including the over $100,000 per year paid to Fujitsu throughout the statutory period). Unfortunately, these revenue sharing payments to Fujitsu and other service providers came at significant cost to Plan participants, who bore the grossly inflated investment management fees that underwrote these revenue sharing payments and were otherwise kept by the Plan's service providers.

***First Plan Iteration's Use of Improper Share Classes***

87.    Before being redesigned in or about late 2011, the Plan offered a massive number of investment options, a stunning number of which were in needlessly expensive share classes. Although the Plan's 2010 Form 5500 does not disclose the share class of each and every investment held by the Plan, based on the information that was disclosed, the Plan was invested in needlessly expensive share classes for at least 40 of the approximately 170 funds and investment options offered under the Plan.[7]

88.    For example, the First Plan Iteration held A shares of the Templeton Global Bond Fund and the Franklin Small-Mid Cap Growth Fund. In 2010 and 2011, these A shares held by the Plan had an expense ratio 25 basis points higher than otherwise identical Advisor class shares.

89.    Defendants made similarly imprudent choices with respect to the Janus family of funds. For example, in 2010 the Plan held class S shares in the Janus Forty Fund with an expense ratio 43 basis points higher than otherwise identical class I shares, which the Plan was eligible to

---

[7] Plaintiffs believe that a less expensive share class was available for far more than 40 of the First Plan's mutual fund offerings, but the Plan's 2009 and 2010 Form 5500 do not contain sufficient information to make such a determination.

invest in given its size and investments in the fund family. That same year, the Plan also held class T shares of the Janus Balanced Fund even though otherwise identical class I shares had an expense ratio that was 17 basis points lower. Indeed, for all of the Janus funds held by the Plan, a less expensive share class was available to the Plan in 2010 than what the Plan held.

90.     As yet another example, the Plan held Investor class shares of the Wells Fargo Government Securities Fund and the Wells Fargo Common Stock Fund in 2011, when it could have held otherwise identical Institutional class shares with an expense ratio 40 basis points lower. Indeed, for the seven Wells Fargo funds within the First Plan Iteration, the Plan offered investor class shares even though otherwise identical institutional class shares with significantly lower fees were available to the Plan. Although some of the institutional share classes had minimum investment amounts, the Plan either met those amounts or could have negotiated a waiver of the minimum investment requirements, had the Plan simply asked for such a waiver.

***Second Plan Iteration's Use of Improper Share Classes***

91.     Although Defendants overhauled the menu of investment options available to Plan participants in or about late 2011, Defendants continued to select and retain excessively expensive share classes for the Second Plan Iteration's investments. As with the First Plan Iteration, at least a quarter of the Plan's investment options were in needlessly expensive share classes.

92.     One such fund was the Amana Growth Fund, which for a number of years has been the Plan's single largest holding. As reported on its Form 5500, at the end of 2014 the Plan held over $225 million in the Fund. Despite this massive investment, the Plan offered higher-cost investor class shares even though institutional class shares became available in 2013. Thus, Plan participants invested in the Amana Growth Fund paid fees of 1.10% per year, when they could have paid only 0.87%. For 2014 alone, this imprudent share class choice resulted in over $500,000 in excess fees.[8]

---

[8] Prudent fiduciaries of a Plan this size should review the Plan's investments and their expenses on at least a quarterly basis to determine whether less expensive alternatives are available. Had Defendants engaged in such a process, the Plan's participants would not have paid the more than

-28-

93.     As additional examples, in 2014 the Plan held over $40 million worth of A shares in the First Eagle Overseas Fund with an expense ratio of 1.15%, compared to 0.9% for otherwise identical I class shares. That same year, the Plan held over $15 million worth of Trust class shares of the Neuberger Berman Genesis Fund with an expense ratio of 1.11% compared to 0.85% for otherwise identical Institutional class shares.  Also in 2014, the Plan held $44 million worth of Premier shares of the AMG TimesSquare Mid Cap Growth Fund with an expense ratio of 1.24% when it could have held Institutional class shares with an expense ratio of 1.04%. In each case, Defendants failed to engage in a prudent process to ensure that they were selecting and retaining the least expensive version of each investment held by the Second Plan Iteration.

94.     Plan participants did not benefit in any way from the Plan's use of more expensive share classes. The more expensive share classes did not provide any additional services to participants. Even if the Plan had shifted all of its monies out of the more expensive share classes, the Plan could have provided the exact same level of overall services to participants.

95.     Multiple courts have held that the failure to use the least expensive class of shares available is a breach of fiduciary duty, because a prudent investor would never select a more expensive investment where a cheaper version of the exact same investment is available. *See Tibble v. Edison Int'l*, 729 F.3d 1110, 1137–39 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Braden v. Wal-Mart Stores*, 588 F.3d 585, 595-96 & n.5 (8th Cir. 2009); *Kruger v. Novant Health*, 131 F. Supp. 3d 470, 476-78 (M.D.N.C. Sept. 17, 2015); *Krueger v. Ameriprise Financial, Inc.*, 2012 WL 5873825, at *10-11 (D. Minn. Nov. 20, 2012); *Gipson v. Wells Fargo & Co.*, 2009 WL 702004, at *5-6 (D. Minn. Mar. 13, 2009).

96.     As noted above, Defendants remedied the share class issues for the mutual funds held by the Plan in January 2016, after learning of Plaintiffs' investigation and its specific subject matter.  Unfortunately for the Plan and its participants, however, Defendants did not refund the millions of dollars in excessive fees that participants needlessly paid due to Defendants' failure to make this change years earlier.

---

one million dollars in excessive fees that have been paid for the Amana Growth Fund since institutional shares were made available in 2013.

**B.      Defendants Failed to Control Recordkeeping and Administrative Fees.**

97.      Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is therefore highly competitive, with many vendors equally capable of providing high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

98.      The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

99.      Given that it costs the same to provide recordkeeping to a participant with $1,000 in her retirement account as a participant with $100,000, the amount of money in participants' accounts is generally not relevant to recordkeeping expenses. Thus, a prudent administrator would not pay recordkeeping fees based on account size, which could cause recordkeeping fees to be far higher than would be the case for per-participant pricing.

100.      Some mutual funds engage in a practice known as "revenue sharing" where the mutual fund takes a portion of the expense ratio it charges investors and pays it to the plan's recordkeeper. In theory, revenue sharing should lower the amount of administrative fees that are otherwise paid from plan assets, given that the shared revenue provides an alternate source of money for such services. However, in practice, the payments often are tantamount to a kickback, as they create an economic incentive for including an imprudent fund in a plan's menu of investment options.

101.      In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a responsible fiduciary must identify *all* fees, including recordkeeping fees and other sources of compensation, paid to the service provider. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

*Recordkeeping Fees Paid in the First Plan Iteration*

102. In 2010, the Plan had 14,100 participants, and in 2011 it had 13,321 participants. The administrator of a similarly sized Plan around 2010 would have been able to obtain excellent recordkeeping services for between $40 and $50 per participant, or between approximately $564,000 and $705,000 in 2010 and $533,000 to $666,000 in 2011. Instead, based upon the direct payments to Fidelity, the investments in the First Plan Iteration, and the sub-transfer agent fees, shareholder servicing fees, 12b-1 fees, and other fees that should have been available from the First Plan Iteration's investments, Plaintiffs estimate that Fidelity received approximately $3.5 million per year in direct payments and revenue sharing dollars. The Plan was therefore paying between $2.8 and $3 million per year in excess recordkeeping fees in the First Plan Iteration. This is the obvious result of Defendants' failure to prudently track the revenue sharing payments received by the Plan's recordkeeper, to ensure that the Plan was paying no more than reasonable compensation to the Plan's recordkeeper.

*Recordkeeping Fees Paid in the Second Plan Iteration*

103. In 2012, the number of participants in the Plan had decreased to 11,621. Based on market reductions in recordkeeping pricing that have been occurring in the 401(k) industry, an administrator of a similarly sized Plan in 2012 would have been able to obtain excellent recordkeeping services for between $35 and $45 per participant, or between approximately $406,700 and $523,000. Instead, the Plan made direct payments of $146,138 to Fidelity Investments Institutional and $535,336 to New York Life Investment Management (which replaced Fidelity in April 2012), both of which also received additional amounts of revenue sharing money that Plaintiffs estimate was approximately $1.7 million total, based upon the sub-transfer agent fees, shareholder servicing fees, 12b-1 fees, and other fees that should have been available from the Plan's investments. Plaintiffs therefore estimate that after accounting for revenue sharing money and direct compensation to the Plan's recordkeepers, the Plan paid approximately **five to six times** what a prudent administrator would have paid for recordkeeping in 2012.

104.    In 2013, the Plan had 9,820 participants, another significant drop from the year before, but again should have been able to obtain excellent recordkeeping services for between $35 and $45 per participant. Therefore an administrator of a similarly sized plan could have obtained recordkeeping services for between approximately $344,000 and $442,000. Instead, even though the number of participants had again declined significantly from the previous year, the Plan made direct payments of $1,224,292 to New York Life, in addition to revenue sharing payments that Plaintiffs estimate were approximately $1.9 million total in light of the sub-transfer agent fees, shareholder servicing fees, 12b-1 fees, and other fees that should have been available from the Plan's investments. Thus, Plaintiffs estimate that after accounting for revenue sharing, the Plan paid approximately **seven to nine times** what a prudent administrator would have paid for recordkeeping in 2013.

105.    In 2014, the Plan had 9,891 participants, for which the administrator of a similarly sized plan would have been able to obtain recordkeeping services for between $35 and $45 per participant, or between approximately $346,000 and $445,000. Instead, the Plan made direct payments of $1,376,817 to New York Life in 2014, in addition to revenue sharing payments that Plaintiffs estimate were approximately $2 million in light of the shareholder servicing fees, sub-transfer agent fees, 12(b)-1 fees, and other fees that should have been available to the Plan's investments. Plaintiffs estimate that after accounting for revenue sharing, the Plan paid approximately **eight to ten times** what a prudent fiduciary would have paid for recordkeeping in 2014.

106.    Recordkeeping was hardly the only category of excessive Plan expenses. Defendants also spent lavishly on consultants, lawyers, and other service providers. Fujitsu even paid itself over a hundred thousand dollars each year for unspecified services. For example, in 2013, the Plan paid four consulting firms (not including Shepherd Kaplan) and three law firms a total of $337,551 in fees. Shepherd Kaplan was paid an additional $594,385 in 2013 for investment advisory services and consulting. On top of it all, the Plan paid $123,248 to Fujitsu for its role as the Plan Administrator. This pattern of excessive administrative fees continues across the statutory period. In 2014, the Plan paid three consulting firms (again, not including Shepherd

-32-

Kaplan) and two law firms $273,578 in fees, plus $636,061 to Shepherd Kaplan, and $136,969 to Fujitsu itself. These fees are much higher than what a Plan of this size should incur.

### C.    Improper Selection and Retention of High-Cost Investments.

107.    In addition to imprudent share classes and excessive administrative fees, the Plan's extremely high overall expenses are also attributable to Defendants' selection and retention of high-cost mutual funds and Defendants' failure to investigate lower-cost alternatives to the expensive funds in the Plan.

108.    In 2012, in plans with over $1 billion in assets, the average expense ratio for domestic equity funds was 0.48%; for international equity funds it was 0.64%; for target-date funds it was 0.41%; for domestic bond funds it was 0.35%; for index funds it was 0.11%; and for money market funds the average was 0.15%. ICI Study at 45.[9]

109.    The expenses for funds within the Plan are significantly higher. In 2013, the 11 actively-managed domestic equity funds in the Plan had expense ratios between 0.65% and 1.73%, all significantly higher than the category average of 0.48%. Four of the five global/international equity funds in the Plan had expense ratios significantly exceeding the category average 0.64%. The target-date funds, where the large majority of the Plan's assets were held, had expense ratios of between 0.69% and 1.08%, significantly higher than the category average of 0.41%. The three actively-managed domestic bond funds averaged between 0.46% and 1.01%, all significantly higher than the 0.35% category average. The money market fund in the Plan had an expense ratio of 0.42% compared to the 0.15% category average. These grossly excessive costs are entirely attributable to the Defendants' selection and retention of high-cost mutual funds.

110.    The above comparisons actually understate the excessiveness of the investment management fees paid by the Plan's participants. As shown by the chart below, the fees for many of the funds within the Plan in 2013[10] (as reflected on the Plan's 2013 Form 5500s) were

---

[9] No statistics were available for stable value funds. *Id*.

[10] Plaintiffs use 2013 as an example. Defendants' imprudent selection and retention of high-cost investments was a continual problem in the First and Second Plan Iterations.

considerably more expensive – indeed, up to **35 times more expensive** – than alternatives in the same investment style:

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Aberdeen Emerging Markets Instl (ABEMX) | 110 bps | Vanguard Emerging Markets Stock Index I (VEMIX)<br><br>American Funds New World R6 (RNWGX) | 12 bps<br><br>65 bps | Emerging Markets Equity | 817%<br><br>69% |
| AlphaSector Premium Fund Class I | 70 bps | Fidelity Spartan 500 Index Advtg (FXAIX)<br><br>American Funds Fundamental Investors R6 (RFNGX) | 2 bps<br><br>31 bps | Large Blend | 3400%<br><br>126% |
| Amana Growth Fund (AMAGX) | 111 bps | TIAA-CREF Large-Cap Growth Idx I (TILIX)<br><br>American Funds Growth Fund of American R6 (RGAGX) | 7 bps<br><br>34 bps | Large Growth | 1486%<br><br>226% |
| Cohen & Steers Institutional Realty Shares (CSRIX) | 75 bps | Fidelity Spartan Real Estate Index (FSRNX)<br><br>DFA Real Estate Securities I (DFREX) | 15 bps<br><br>19 bps | Real Estate | 413%<br><br>305% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Driehaus Micro Cap Growth Strategy Fund | 131 bps | Vanguard Russell 2000 Growth Index Fund Instl (VRTGX)<br><br>T. Rowe Price Institutional Small-Cap Stock Fund (TRSSX) | 8 bps<br><br><br><br>70 bps | Small Growth | 1538%<br><br><br><br>87% |
| Driehaus International Small Cap Growth Fund (DRIOX) | 173 bps | Vanguard FTSE All-Wld ex-US Sm Cap Idx I (VFSNX)<br><br>DFA International Small Company I (DFISX) | 19 bps<br><br><br>54 bps | Foreign Small Cap | 811%<br><br><br>220% |
| Deutsche Floating Rate Fund Class S (DFRPX) | 101 bps | Voya Floating Rate P (IFRPX) | 11 bps | Bank Loan | 818% |
| EARNEST Partners International Fund | 85 bps | Fidelity International Index Instl (FSPNX)<br><br>Dodge & Cox International Stock (DODFX) | 7 bps<br><br><br>64 bps | Foreign Large Blend | 1114%<br><br><br>33% |
| Fidelity Retirement Money Market Portfolio (FRTXX) | 42 bps | Oppenheimer Institutional Money Mkt E (IOEXX) | 10 bps | Money Market | 320% |
| First Eagle Overseas Fund Class A (SGOVX) | 115 bps | Schwab Fundamental Int'l Large Co. Index (SFNNX)<br><br>DFA International Core Equity I (DFIEX) | 52 bps<br><br><br><br>39 bps | Foreign Large Value | 121%<br><br><br><br>195% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Franklin Templeton Emerging Markets Debt Opportunities Fund (FEMDX) | 107 bps | Vanguard Emerging Markets Government Bond Index Adm (VGAVX)<br><br>GMO Emerging Country Debt III (GMCDX) | 34 bps<br><br>62 bps | Emerging Markets Bonds | 215%<br><br>73% |
| Fujitsu LifeCycle 2005 Fund | 74 bps | Fidelity Freedom Index 2005 (FJIFX)<br><br>T. Rowe Price Retirement 2005 (PARGX) | 16 bps<br><br>59 bps | Target-Date 2005 | 363%<br><br>25% |
| Fujitsu LifeCycle 2010 Fund | 79 bps | Vanguard Target Retirement 2010 Investor (VTENX)<br><br>American Funds 2010 Target Date Retire R6 (RFTTX) | 16 bps<br><br>36 bps | Target-Date 2010 | 394%<br><br>119% |
| Fujitsu LifeCycle 2015 Fund | 83 bps | Vanguard Target Retirement 2015 Investor (VTXVX)<br><br>American Funds 2015 Target Date Retire R6 (RFJTX) | 16 bps<br><br>37 bps | Target-Date 2015 | 419%<br><br>124% |
| Fujitsu LifeCycle 2020 Fund | 87 bps | Vanguard Target Retirement 2020 Investor (VTWNX)<br><br>American Funds 2020 Target Date Retire R6 (RRCTX) | 16 bps<br><br>39 bps | Target-Date 2020 | 444%<br><br>123% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Fujitsu LifeCycle 2025 Fund | 91 bps | Vanguard Target Retirement 2025 Fund Investor (VTTVX) | 17 bps | Target-Date 2025 | 435% |
| | | American Funds 2025 Target Date Retire R6 (RFDTX) | 42 bps | | 117% |
| Fujitsu LifeCycle 2030 Fund | 96 bps | Vanguard Target Retirement 2030 Fund Investor (VTHRX) | 17 bps | Target-Date 2030 | 465% |
| | | American Funds 2030 Target Date Retire R6 (RFETX) | 43 bps | | 123% |
| Fujitsu LifeCycle 2035 Fund | 100 bps | Vanguard Target Retirement 2035 Fund Investor (VTTHX) | 18 bps | Target-Date 2035 | 456% |
| | | American Funds 2035 Target Date Retire R6 (RFFTX) | 43 bps | | 133% |
| Fujitsu LifeCycle 2040 Fund | 105 bps | Vanguard Target Retirement 2040 Fund Inv. (VFORX) | 18 bps | Target-Date 2040 | 483% |
| | | American Funds 2040 Target Date Retire R6 (RFGTX) | 44 bps | | 139% |
| Fujitsu LifeCycle 2045 Fund | 106 bps | Vanguard Target Retirement 2045 Fund Inv. (VTIVX) | 18 bps | Target-Date 2045 | 489% |
| | | American Funds 2045 Target Date Retire R6 (RFHTX) | 45 bps | | 136% |

-37-

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Fujitsu LifeCycle 2050 Fund | 107 bps | Vanguard Target Retirement 2050 Fund Inv. (VFIFX) | 18 bps | Target-Date 2050 | 494% |
| | | American Funds 2050 Target Date Retire R6 (RFITX) | 45 bps | | 138% |
| Fujitsu LifeCycle 2055 Fund | 108 bps | Vanguard Target Retirement 2055 Fund Inv. (VFFVX) | 18 bps | Target-Date 2055 | 500% |
| | | American Funds 2055 Target Date Retire R6 (RFKTX) | 48 bps | | 125% |
| Fujitsu LifeCycle Income | 69 bps | BlackRock LifePath Index Retirement Fund Class K Shares (LIRKX) | 17 bps | Target-Date Retirement | 306% |
| | | Vanguard Target Retirement Income Fund Inv. (VTINX) | 16 bps | | 331% |
| Fujitsu Stable Value Fund | 37 bps | Vanguard Retirement Savings Trust | 32 bps | Stable Value | 16% |
| GRT Value Fund Advisor Class (GRTVX) | 173 bps | Vanguard Small Cap Value Index I (VSIIX) | 8 bps | Small-Cap Value | 2063% |
| | | Perkins Small Cap Value N (JDSNX) | 56 bps | | 209% |
| Neuberger Berman Genesis Fund Trust Class (NBGEX) | 110 bps | Vanguard Small Cap Growth Index I (VSGIX) | 8 bps | Small-Cap Growth | 1275% |
| | | T. Rowe Price Instl Small-Cap Stock (TRSSX) | 68 bps | | 62% |

-38-

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Neuberger Berman High Income Bond Fund Institutional Class (NHILX) | 69 bps | Vanguard High-Yield Corporate Adm (VWEAX) | 13 bps | High-Yield Bond | 431% |
| RidgeWorth Mid-Cap Value Equity Fund I Shares (SMVTX) | 108 bps | Vanguard Mid-Cap Value Index Adm (VMVAX) Vanguard Selected Value Inv (VASVX) | 9 bps 43 bps | Mid-Cap Value | 1100% 151% |
| Templeton Global Bond Fund Advisor Class (TGBAX) | 61 bps | Vanguard Total Int'l Bond Index I (VTIFX) Templeton Global Bond R6 (FBNRX) | 12 bps 51 bps | World Bond | 408% 20% |
| TimesSquare Mid Cap Growth Fund Premier Shares (TMDPX) | 125 bps | Vanguard Mid-Cap Growth Index Fund Adm (VMGMX) T. Rowe Price Instl Mid-Cap Equity Growth Fund (PMEGX) | 9 bps 61 bps | Mid-Cap Blend | 1289% 107% |
| Wasatch Large Cap Value Fund Investor Class Shares (FMIEX) | 116 bps | TIAA-CREF Large-Cap Value Idx I (TILVX) American Funds American Mutual Fund R6 (RMFGX) | 7 bps 31 bps | Large Value | 1557% 274% |

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| WHV International Equity Fund Class A (WHVAX) | 150 bps | Vanguard Total International Stock Index I (VTSNX)<br><br>American Funds Europacific Growth R6 (RERGX) | 12 bps<br><br>50 bps | Foreign Large Blend / Growth | 1150%<br><br>200% |

111.     Defendants benefited from the use of these high-cost investments. Funds with higher costs have more fees that can be used to make revenue sharing payments to the Plan. Low-cost funds that are run more efficiently often have fewer dollars that can be transferred to plans through revenue sharing. By selecting these higher cost investments, Defendants generated more revenue that could be used to pay Plan expenses (including the more than $100,000 per year that was paid to Fujitsu throughout the relevant period).

112.     Had Defendants been managing the Plan in a cost-conscious manner, Defendants would have removed the excessively-costly investments in the Plan in favor of prudent alternative investments that offered similar or superior performance with significantly less expense. As a result of these breaches of the duties of loyalty and prudence, Plan participants have paid millions of dollars in excess fees per year under both the First and Second Plan Iterations.

II.     DEFENDANTS' VIOLATIONS OF ERISA DUE TO IMPRUDENT PLAN DESIGN.

   A.     Defendants' Management and Design of the First Plan Iteration was Imprudent.

113.     One of the central functions of 401(k) plan fiduciaries is to screen and select a menu of prudent investments, and then monitor those investments to ensure each investment remains prudent, removing or replacing investments as necessary. Yet, Defendants effectively punted this responsibility to Plan participants by providing approximately 170 investment options in the First Plan Iteration.

114.     Many of the funds in this list were imprudent options for a participant's retirement

savings, consistently underperformed their benchmark indices, charged excessive fees, and were selected because of the revenue sharing payments they generated for the Plan's service providers, rather than the benefit they provided to Plan participants. For example, more than half of the mutual funds in the First Plan Iteration were managed by Fidelity, and paid revenue sharing to Fidelity far beyond a reasonable rate for the services provided.

115.   By providing such a massive number of investment options in the Plan, Defendants ensured that fewer employees would participate in the Plan, and that those that did would suffer. Research has demonstrated that large investment menus in 401(k) plans result in inferior, expensive options that discourage employees from investing, and confuse those who do participate, often causing them to make more conservative, less informed choices. Mercer Bullard, *The Social Costs of Choice, Free Market Ideology and the Empirical Consequences of the 401(k) Plan Large Menu Defense*, 20 Conn. Ins. L.J. 335 (Spring 2014). In contrast to the 170-plus investment options that Defendants provided, defined contribution plans usually provide only 14 investment options, excluding target-date funds. Callan Investments Institute, *2014 Defined Contribution Trends*, p. 28, https://www.callan.com/research/files/753.pdf (last visited Nov. 20, 2015). Providing a much larger number of funds also harms participants by undermining potential economies of scale, resulting in higher plan expenses, and it foists upon participants responsibility for finding the prudent investments from the slew of available options.

116.   As evidenced by the large number of investment options in the First Plan Iteration, Defendants failed to engage in a prudent and loyal fiduciary process to select and maintain only prudent and reasonably priced Plan investments options. This is confirmed by the fact that Defendants provided participants multiple mutual funds in two different share classes,[11] provided mutual funds in share classes that were more expensive than other classes available to the Plan, and provided mutual funds that had excessively high fees.

117.   Providing such a large number of investment options also ensured that participants would experience poor investment results overall. Many Nobel Prize winners in economics have

_____

[11] The Plan's 2010 Form 5500 showed that the Plan owned both Class S and Class T shares of the Janus Fund, and also held both Class A and Class F shares of the Dreyfus Equity Growth Fund.

concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (January/February 1991). While certain funds might be the extremely rare exception that outperforms its benchmark index, the significant majority will underperform their benchmark index, and the amount of underperformance will typically be the amount of fees and transaction costs within the particular fund.

118.    Therefore, by populating the First Plan Iteration with a large number of funds with overlapping investment objectives, Defendants statistically guaranteed that the Plan would perform no better than average on a gross basis (i.e., revert to the mean), and far worse than average on a net basis after accounting for fees because Defendants failed to use the fund's size to negotiate low cost investment options and selected high-cost investments.

**B.      Defendants' Design and Management of the Second Plan Iteration was Imprudent.**

119.    Fujitsu hired Shepherd Kaplan as the Plan's investment adviser in late 2011 to redesign the Plan.  Fujitsu was directly responsible for this Plan overhaul and for overseeing the performance of Shepherd Kaplan to ensure it redesigned and managed the Plan's investments in a prudent manner.

120.    The central feature of the Second Plan Iteration was the creation of custom "target-date" funds called the "Fujitsu LifeCycle Funds."  Not only did the Second Plan Iteration feature these funds, but upon their creation, roughly a quarter of the First Plan Iteration's assets were "mapped" into these target-date funds.[12]

121.    Generally, target-date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement (i.e., the "target-date"). Therefore,

---

[12] The remaining assets in the First Plan Iteration were mapped into the new funds added to the Plan as part of the Second Plan Iteration. Thus, the various problems with those funds, which will be discussed below, also affected those participants whose assets were not mapped over to the Plan's LifeCycle Funds.

target-date funds can be attractive to participants who do not want to actively manage their retirement savings to maintain a diversified portfolio.

122.    The marketplace for target-date funds is replete with competitive target-date mutual funds and collective trusts, as well as experienced investment advisers with published track records in implementing asset allocation and target-date strategies. But rather than hire one of these investment advisers, Defendants hired Shepherd Kaplan, who had no particular expertise in designing or implementing target-date funds, and no published track record managing such strategies. A prudent fiduciary of a plan with over $1 billion in assets would not have hired Shepherd Kaplan given its lack of expertise and experience with target-date strategies.

123.    Designing the target-date funds was a two-step process. First, Shepherd Kaplan developed a target asset allocation for each target date fund. Second, mutual funds were selected to represent each asset or sub-asset class within each of the target-date funds. Each of these steps was badly bungled.

124.    The asset allocation percentages for the LifeCycle funds were fundamentally flawed, particularly for the target-date funds aimed at investors with 10 or more years until retirement. For participants with longer-term time horizons (generally investors slated to retire in 2025 or later), a wildly excessive percentage of the LifeCycle Funds' assets were allocated to speculative asset classes such as natural resources, micro cap stocks, emerging market stocks, emerging market bonds, and real estate limited partnerships. *See* Ex. B App'x E (showing many funds with 10% allocations to three or four of these categories). More generally, the asset allocation strategies reflected a preoccupation with unique and nontraditional asset and sub-asset classes; even the more conservative LifeCycle Funds had excessive percentages devoted to investments such as emerging markets bonds and floating-rate bank loans.

125.    The second step of the target-date fund design process, selecting mutual funds to implement the target asset allocations, was also mishandled. First, as discussed above, Defendants selected extremely expensive mutual funds, and as a result, the Fujitsu LifeCycle funds themselves had extremely high fees. In 2013, the LifeCycle funds' fees ranged from 0.74% to 1.08%, compared to the average annual expense of 0.41% for target-date funds held by similarly

-43-

sized plans. ICI Study at 45. Thus, participants paid vastly more in fees than if the Plan had merely used target-date funds with average expenses.

126.    Additionally, the mutual funds selected for the LifeCycle funds were maladapted for use as part of an asset allocation strategy. The theory underlying asset allocation is that by analyzing the historical and/or predicted risk and return levels of various asset and sub-asset classes, as well as the relationship between each of these asset and sub-asset classes, you can design a portfolio that will maximize potential returns with a given level of risk. Therefore, a target-date fund's ability to accurately employ its target asset allocation depends heavily on choosing underlying investments that actually emulate the asset or subasset class that the investment is intended to represent. Investment options with idiosyncratic investment strategies, or those that deviate significantly from their designated subasset class (referred to as "style drift"), are inappropriate selections for use in within a target-date fund's asset allocation strategy. Defendants were aware of these problems, and accounted for it within the Plan Document.

> Fluctuations or drift in the style of a particular investment that has been selected to represent a given Asset Class may occur. In such events, the Named Investment Fiduciary may, in its sole and absolute discretion, elect to retain the investment until such time as Named Investment Fiduciary determines that it is appropriate to remove or replace the investment.

Ex. A, App'x E at E-4.

127.    Despite its apparent awareness of this issue, Shepherd Kaplan filled the LifeCycle funds with investments that used idiosyncratic investment strategies that caused the funds to significantly deviate from their designated asset or subasset class. For example, the Amana Growth Fund was included in the target-date funds as a large cap growth investment. In this role, the Amana Growth Fund has been the Plan's largest holding for years. The Amana Growth Fund is managed according to Islamic principles, and therefore invests in accordance with Sharia law. As a result, the Fund does not hold financial stocks, or stock in excessively leveraged firms, because of the Islamic prohibition on paying or receiving interest. The Fund also does not hold real estate or energy stocks. Due to these constraints, the Amana Growth Fund's sector

-44-

weightings (and subsequently its investment results) deviate significantly from the large cap growth benchmarks, making it an improper choice to provide "large cap growth" exposure within a target-date fund's asset allocation model.

128.   The Fujitsu target-date funds also included the First Eagle Overseas Fund as its primary international holding meant to represent equities of foreign companies. That fund is an inappropriate choice for such a category because the fund often takes large cash positions, sometimes holding as much as 15% of its assets in cash. Further, the Fund occasionally concentrates heavily in commodities such as gold. Again, such variation from international equity benchmarks makes it an improper choice for that category in a target-date fund's asset allocation model.

129.   The LifeCycle Funds held shares in the AlphaSector Premium Fund to provide exposure to large cap blend stocks. But the AlphaSector Premium Fund relied heavily on a market timing strategy. As the Fund's fact sheet disclosed, the fund's results depended on "focusing on avoiding losses of its underlying [investments]" by using its "ability to move defensively to large cash positions in periods of broader market weakness." http://www.reliance-trust.com/cit/pages/Backup20120718/docs/Equity/AlphaSector/Fact_Sheet/Archive/12312011_Class_I.pdf. The AlphaSector Premium Fund was incompatible with a target-date asset allocation strategy, which depends on funds staying fully invested in their designated subasset classes through all market cycles. The more conservative asset classes within the strategy are designed to balance whatever risks or losses might occur when large company stocks underperform; but the strategy depends on the fund to provide the overall returns large company stocks would be expected to produce through all market cycles.

130.   Aside from the selection of funds with high fees and that used idiosyncratic investment strategies, Shepherd Kaplan and Fujitsu included a large number of funds with extremely short performance histories within the Fujitsu LifeCycle funds. Mutual fund performance can fluctuate rather dramatically, and these fluctuations are often attributable to luck rather than skill by the investment manager. For that reason, in general, a prudent fiduciary will avoid investments that do not have at least a five-year performance history.

-45-

131.    But Shepherd Kaplan and Fujitsu selected and retained numerous funds with short performance histories. For example, from 2011 through at least 2013, the Plan held the WHV International Equity Fund, despite the fund having existed for less than three years. Likewise, Defendants used the EARNEST Partners International Fund within the LifeCycle Funds despite the fact that the Fund came into existence in 2010. The Second Plan Iteration also included the GRT Value Fund even though it had only been launched in 2008. Finally, in 2012, the Plan came to hold over $16 million of the AlphaSector Premium Fund, even though it was only launched in July 2011 (by the end of 2014, the Plan's holdings of this Fund had increased to $23 million).

132.    Not surprisingly, given these fundamental flaws in how the LifeCycle funds were designed and implemented, the Fujitsu target-date funds have generally underperformed their benchmark indices (the Dow Jones target date indices) by significant margins. For example, as of November 30, 2015, the Fujitsu LifeCycle 2030 Fund had averaged returns of 5.35% per year since its October 2011 inception, while its benchmark index had returned 7.91% per year. The 2040 LifeCycle Fund had earned 5.87% per year since its inception, while its benchmark index had earned 9.41% per year. Similar disparities exist for a majority of the Plan's target-date funds.

133.    Overall, as of November 30, 2015, three-quarters of the Fujitsu target-date funds had underperformed compared to their benchmark indices (the Dow Jones Target Indices). Further, the three funds that outperformed their benchmark index—the LifeCycle 2005, LifeCycle 2010, and LifeCycle 2015 funds—held very little of the Plan's assets (less than $5 million was invested in the 2005 and 2010 Funds combined as of the end of 2015), and had only outperformed their indices by less than one percent per year. Overall, Defendants' imprudent design and implementation of the Plan's LifeCycle Funds has cost Plan participants tens of millions of dollars in lost earnings.

134.    In or around November 2015, Defendants learned of Plaintiffs' investigation and its specific subject matter. They responded by removing Shepherd Kaplan as the Plan's investment advisor. Then, in March 2016, Defendants replaced the Fujitsu LifeCycle target-date funds with a set of Fujitsu-specific target-date funds managed by a new fund advisor—Callan Associates Inc.  In an obvious attempt to whitewash the poor performance history of the Fujitsu

-46-

LifeCycle funds, the new funds were named the "Fujitsu Diversified [Target Year] Funds."

135.    Plaintiffs did not have knowledge of all material facts (including, among other things, availability of less expensive alternative investments, the costs of the Plan's investments compared to those in similarly-sized plans, investment performance versus other available alternatives, the excessiveness of the Plan's recordkeeping costs, the availability of less expensive share classes of investments held by the Plan, and comparisons of the Plan's overall costs to the costs of other similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes and motivations for selecting, monitoring, and removing Plan investments, Defendants' processes for designing and implementing the First and Second Plan Iterations, Defendants' process for selecting and monitoring the Plan's investment advisor, and Defendants' processes for selecting and monitoring the Plan's service providers), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

136.    Plaintiffs bring this action on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

137.    Plaintiffs assert their claims in Counts I - II on behalf of the following class: [13]

> All participants and beneficiaries of the Fujitsu Group Defined Contribution and 401(k) Plan at any time on or after June 30, 2010. Excluded from this class are Defendants, their directors, and any employees with responsibility for the Plan's investment or administrative

---

[13] Plaintiffs reserve the right to revise their class definition, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

functions.[14]

138.  Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has had between approximately 9,800 and 14,000 participants during the applicable statutory period.

139.  Typicality:  Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plan, who have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

140.  Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class, as their interests are aligned with the Class that they seek to represent and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

141.  Commonality:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.  Whether Defendants are fiduciaries of the Plan;

b.  Whether Defendants breached the duty of loyalty by engaging in the conduct described herein;

c.  Whether Defendants breached the duty of prudence by engaging in the conduct described herein;

d.  Whether Fujitsu and the Administrative Committee (and its members) breached their duty to monitor other Plan fiduciaries;

e.  The proper measure of monetary relief; and

f.  The proper form of equitable and injunctive relief.

---

[14] To the extent necessary for purposes of the litigation, this Class may be broken down into three subclasses covering the periods in which the various Plan iterations were in effect.  The named Plaintiffs collectively cover all three Plan periods.

-48-

142.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

143.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Plan participants, as a practical matter, would be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court such as removal of particular Plan investments or removal of a Plan fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

144.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint has applied to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

145.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

146.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

147.    As described throughout this Complaint, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan by, *inter alia*:

    a. Selecting and maintaining needlessly expensive share classes of mutual funds as investment options for the Plan;

    b. Causing the Plan to pay excessive recordkeeping and administrative fees, including the payment of excessive revenue sharing to the Plan's service providers;

    c. Including and retaining mutual funds with excessively high expense ratios compared to alternative mutual funds (both actively and passively managed) with the same investment strategy;

    d. Hiring an investment advisor with no public record managing target-date strategies to design and implement target-date funds for the Plan;

    e. Creating and offering new and untested target-date funds with allocations that were fundamentally flawed, and holding underlying funds that were inappropriate given their lack of performance history, idiosyncratic investment methodologies, and/or failure to adhere to a predictable investment style; and

    f. Failing to promptly remove the imprudent individual investments and the target-date funds more broadly when it was apparent that each was imprudent.

148.    The above-mentioned imprudent actions and failures to act in a prudent manner (combined with Defendants' self-interest in arranging for revenue sharing payments to Fujitsu and other service providers) demonstrate that Defendants did not make Plan investment decisions based solely on the merits of each investment and what was in the interest of Plan participants. Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the

-50-

exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

149.   Through the actions and omissions described *supra* in paragraph 148 and elsewhere in this Complaint, Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

150.   Each Defendant performing investment and administrative duties knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of these breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy other Defendants' breaches. For these reasons, Defendants are also liable as co-fiduciaries under 29 U.S.C. § 1105.

151.   Each Defendant is personally, jointly, and severally liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2), and must make good to the Plan the losses resulting from the aforementioned breaches.

152.   On behalf of the Plan, Plaintiffs are also entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3) (including the equitable relief described in the Prayer for Relief), recovery of pre-judgment interest, *see Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007), and attorney fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine.

## COUNT II
### Failure to Monitor Fiduciaries

153.   As alleged throughout the Complaint, Fujitsu and the Administrative Committee are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21), among other laws.

154.    Fujitsu is responsible for appointing and removing members of the Administrative Committee and the Investment Committee, and for appointing and removing the Investment Fiduciary.

155.    The Administrative Committee is responsible for appointing and removing the Plan's recordkeeper, and all other aspects of the Plan's administration unrelated to investment.

156.    Given that Fujitsu had overall oversight responsibility for the Plan, the fiduciary responsibility to appoint and remove members of the Administrative Committee and the Investment Committee, and the fiduciary responsibility to appoint and remove the Plan's Investment Fiduciary, Fujitsu had a fiduciary responsibility to monitor the performance of these other fiduciaries, including the Administrative Committee, the Investment Committee, the Investment Fiduciary and the individual Defendants, to ensure they were performing their duties in a manner that was consistent with their fiduciary duties under ERISA.

157.    Given that the Administrative Committee had overall administrative responsibility for the plan, the Administrative Committee has a fiduciary duty to select and monitor the Plan's recordkeeper, consultants and other service providers, and ensure that fees paid to such service providers are prudent and reasonable.

158.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

159.    To the extent that Fujitsu's or the Administrative Committee's fiduciary monitoring responsibilities were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

160.    Fujitsu and the Administrative Committee breached their fiduciary monitoring duties by, among other things:

        a.   Failing to monitor and evaluate the performance of their appointees or to have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

b.  failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein in violation of ERISA;

c.  failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, or in that they caused the plan to pay excessive administrative fees, all to the detriment of the Plan and Plan participants' retirement savings.

161.  As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Fujitsu and the Administrative Committee discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.

162.  Fujitsu and the Administrative Committee, including its individual members, are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Complaint, and are subject to other equitable or remedial relief as appropriate. Each of these Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches, and thus each Defendant is liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Johnson, Perry, Weir, White, Salisbury, Hitt, Collier, and Laine, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A declaration that Defendants have breached their fiduciary duties in the manner described in the Complaint;

D.   An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above and to restore the Plan to the position it would have been in but for such breaches;

E.   An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

F.   Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; removal of imprudent mutual funds as core investment options; transfer of Plan assets in imprudent mutual funds to prudent alternative investments; and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

G.   An award of pre-judgment interest;

H.   An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

I.   An award of such other and further relief as the Court deems equitable and just.

Dated: June 30, 2016                 **NICHOLS KASTER, PLLP**


                                     By:    /s/ Rebekah L. Bailey
                                            Rebekah L. Bailey

                                     Attorney for Plaintiffs and the proposed Class

-54-